**SSAB SVENSKT STÅL AB, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Bethlehem Steel Corp., Defendant-Intervenor.**

Slip Op. 97–123.
Court No. 96–05–01372.

United States Court of International Trade.

Aug. 29, 1997.

Perkins Coie (Thomas V. Vakerics, Mary Rose Hughes and Mark T. Wasden), Washington, DC, for plaintiff.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (Velta A. Melnbrencis) and Dean A. Pinkert, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, Washington, DC, for defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan and Ellen Schneider), Washington, DC, for defendant–intervenor.

## MEMORANDUM OPINION

DICARLO, Senior Judge.

Plaintiff SSAB Svenskt Stål AB moves for judgment on the agency record pursuant to USCIT Rule 56.2. SSAB Svenskt Stål AB is a Swedish holding company. Two of its wholly-owned subsidiaries, SSAB Oxelösund AB ("SSOX") and SSAB Tunnplåt AB ("SSTP") are the manufacturers of the steel in question, collectively referred to herein as "SSAB". Tibnor AB ("TAB"), a partially-owned subsidiary, is a distributor of the steel.

SSAB is seeking review of *Certain Cut–to–Length Carbon Steel Plate From Sweden: Final Results of Antidumping Duty Administrative Review*, 61 Fed.Reg. 15,772 (Dep't Comm.1996) [hereinafter *Final Determination*]. Commerce assigned a final antidumping duty margin of 8.28% against entries of certain SSAB cut-to-length carbon steel plate from Sweden. *Id.* at 15,782. SSAB raises four issues:

1. Whether Commerce erred by failing to deduct from SSAB's home market prices the rebates which SSAB paid to certain home market customers;

2. Whether Commerce erred by excluding SSAB downstream sales to TAB for the purpose of calculating foreign market value;

3. Whether Commerce erred in applying (1) zero packing costs to home market sales for SSOX and (2) deducting the highest reported packing cost from all of SSOX's U.S. sales;

4. Whether Commerce erred in making an upward adjustment to all home market sales made via TAB, based on errors discovered in certain commissions reported by SSAB.

(Pl.'s Mot. Supp. J. on Agency R. at 3.)

Once Commerce makes its final determination, the court's role is to uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp.*

*v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Jurisdiction is proper under 28 U.S.C. § 1581(c) (1994).

## Discussion

### I. Deduction of Rebates

■ During the period of review, SSAB granted certain home-market customers rebates on the value of their total purchases. *Final Determination* at 15,779; (Pl.'s Br. at 10.) Commerce declined to adjust the foreign market value based upon these home-market rebates, finding that the rebates were made on a customer-specific, not transaction-specific basis. Based upon the decision in *Torrington Co. v. United States*, 82 F.3d 1039 (Fed.Cir.1996), rendered after the *Final Determination* was issued, the government asks that this issue be remanded. (Def.'s Mem. Partial Opp'n Pl.'s Mot. J. on Agency R. at 6–8.) According to the government, under *Torrington*, the rebates in issue are direct selling expenses, for which a circumstance-of-sale adjustment to foreign market value is appropriate, if (1) the record demonstrates that the rebates were paid on either a fixed and constant percentage-of-sales value or on a fixed and constant Swedish Kroner-per-ton of total tonnage sold and (2) the record demonstrates there was sufficient quantification for a circumstance-of-sale adjustment. The government asks that Commerce be given an opportunity on remand to review the record and see if the above two conditions have been met. Plaintiff SSAB argues that the conditions are more than sufficiently met, and that the court should order that the rebate adjustment be granted outright. Given that Commerce has not specifically considered this issue, and given the court's standard of review, the court finds it is appropriate to remand the issue for Commerce to make the determination in the first instance as to the propriety of the rebate adjustment.

### II. SSAB Related–Party Sales to TAB

■ In determining an antidumping duty, Commerce calculates (1) the foreign market

value (FMV) and U.S. price of each entry of merchandise involved and (2) the amount, if any, by which the FMV of each entry exceeds U.S. price. In general, FMV of the imported merchandise "shall" be the price at which such or similar merchandise is sold or offered for sale in the country from which exported. 19 U.S.C. § 1677b(a)(1)(A) (1988). However, when the merchandise is sold in the exporting country to a related party, the statute does not require that those sales be used in determining FMV:

> If such or similar merchandise is sold or, in the absence of sales, offered for sale through a sales agency or other organization related to the seller ..., the prices at which such or similar merchandise is sold or, in the absence of sales, offered for sale by such sales agency or other organization *may* be used in determining the foreign market value.

19 U.S.C. § 1677b(a)(3) (emphasis added). As the statute does not specify circumstances under which related party sales are to be used to calculate FMV, Commerce must necessarily be accorded deference. *Saarstahl AG v. United States,* 78 F.3d 1539, 1544 (Fed.Cir.1996) (explaining "[i]n the absence of specific mandates ... Commerce's approach must be accorded deference.")

During the period of review, the implementing regulation provided, in relevant part:

> If a producer or reseller sold such or similar merchandise to a person related as described in [19 U.S.C. § 1677(13) ], the Secretary ordinarily will calculate foreign market value based on that sale only if satisfied that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller.

19 C.F.R. § 353.45(a) (1994).

█ Commerce's normal practice is to disregard the manufacturer's prices to its related distributors or dealers in calculating foreign market value unless the manufacturer demonstrates to Commerce's satisfaction that the prices are at arm's length. Under its arm's length test, Commerce compares, on a product-by-product basis, the weighted-average price of total sales from the respondent

to the related customer with the weighted-average price of total sales from the respondent directly to unrelated parties. Then,

> [i]f the customer-specific related/unrelated price ratio [is] greater than or equal to 99.5 percent ..., [Commerce] determine[s] that all sales to that related customer [are] made at arm's length.... Conversely, if the customer-specific related/unrelated price ratio [is] less than 99.5 percent, [Commerce] determine[s] that all sales to that related customer [are] not arm's length transactions because, on average, that customer was paying less than unrelated customers for the same merchandise.

*Certain Cold–Rolled Steel Flat Products from Argentina,* 58 Fed.Reg. 7,066, 7,069 app. II(A) (Dep't Comm.1993) (prelim.determination). In performing the test on SSAB's sales to TAB, Commerce found that the overall ratio was less than 99.5%, *i.e.,* the sales prices to TAB, on average, were not comparable for the same products. Commerce therefore decided to exclude all such sales.

Plaintiff SSAB disputes the validity of this test, because it allegedly fails to test for the "true" issue: whether the respondent actually manipulated its prices to the related party. (Pl.'s Br. at 18–19.) SSAB argues that the record evidence makes abundantly clear that it could not have and indeed did not manipulate prices. Specifically, SSAB claims that (1) TAB is not a shell company; (2) TAB is not a "captive distributor;" (3) SSAB attempted to obtain as high a price as possible from TAB; and (4) TAB purchased steel from SSAB and unrelated suppliers at the same prices. *Id.* at 19, 21–23. SSAB also urges the court to impose upon Commerce additional factors by which to test for price manipulation, including an examination of stock ownership and the nature of the related distributor's operations. *Id.* at 26–27.

In *Usinor Sacilor v. United States,* 18 CIT 1155, 1158, 872 F.Supp. 1000, 1004 (1994), the court held that it would uphold Commerce's arm's length test unless the test was shown to be unreasonable because it distorted price comparability. Plaintiff has not pointed to evidence on the administrative record which would reveal that application of this broad-

averaging test would result in distorted price comparability, *i.e.*, would distort the objective measurement of whether the related sale is representative of plaintiff's general pricing practice. *See Micron Technology, Inc. v. United States,* 19 CIT ——, ——, 893 F.Supp. 21, 38 (1995) ("This court will uphold the test that Commerce selects to measure whether sales to related parties were made at arm's length prices unless that test is shown to be unreasonable"), *aff'd,* 117 F.3d 1386 (Fed.Cir.1997). Furthermore, this court has previously rejected a respondent's attempts to impose qualitative factors onto the price-based test applied by Commerce. In *NTN Bearing Corp. of America v. United States,* 19 CIT ——, ——, 905 F.Supp. 1083, 1099–1100 (1995), the court rejected the notion that Commerce's arm's length test was flawed because it did not take into account certain qualitative factors. *See also NSK Ltd. v. United States,* 21 CIT ——, ——, 969 F.Supp. 34, 55 (1997) (noting "[t]his Court has also rejected the contention that Commerce should consider other factors (*i.e.,* factors other than price) in determining comparability"). Commerce's decision to disregard sales to TAB in calculating foreign market value is supported by substantial evidence on the record, and Commerce's application of the arm's length test is in accordance with law.

### III. U.S. and Home Market Packing Expenses

■ During verification, SSOX (one of the SSAB subsidiaries) was unable to verify the reported packing expense figures for either its U.S. or home market sales. *Final Determination* at 15,773. As a result, Commerce (1) assigned to all SSOX U.S. sales the highest reported packing cost for U.S. sales and (2) did not deduct SSOX's reported home market packing expense from foreign market value. *Id.* Plaintiff SSAB argues that Commerce's choice of BIA is punitive and unduly harsh.

Under 19 U.S.C. § 1677e(b) (1988), if Commerce is unable to verify the accuracy of the information submitted, "it shall use the best information available to it as the basis for its action[.]" Commerce's questionnaire re-quested that SSAB report packing expenses, and SSAB submitted packing expenses. Prior to verification, Commerce transmitted a verification outline to SSAB. In this outline, Commerce requested that SSAB be "prepared to demonstrate the method that [it] used to determine the amount of expenses for the relevant cost centers that was attributable to packing[,]" and be prepared to "trace [its] total reported packing expenses for the review period to [its] audited financial statements[.]" Letter from Edward C. Yang, Div. Dir., Office of Agreements Compliance, Dep't Comm., to Thomas Vakerics, Perkins Coie encl. at 9 (June 5, 1995). At verification, however, SSOX failed to support the packing expense figures that were submitted by SSAB, the parent, holding company. *Final Determination* at 15,773. Commerce therefore used BIA as provided for in 19 U.S.C. § 1677e(b).

SSAB argues that Commerce's chosen BIA is punitive and should be struck down, because SSAB never failed to cooperate with Commerce and made good faith efforts to prepare packing costs data, despite the fact that SSOX did not have a packing department. SSAB asserts that Commerce should therefore have used a less adverse BIA to fill in gaps discovered upon verification. (Pl.'s Br. at 29–30.)

Commerce uses partial BIA when, as in this case, a respondent's responses are deficient or cannot be verified in limited respects, yet are reliable and verified in most other respects. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France,* 57 Fed.Reg. 28,360, 28,379 (Dep't Comm.1992) (Final results admin. review). Substantial evidence on the record supports Commerce's decision to employ partial BIA and its choice of BIA. SSAB provided SSOX's U.S. packing cost information, but plaintiff could not provide necessary information to verify the packing cost submissions. Given this circumstance, the court finds Commerce was justified in resorting to partial BIA. In deciding to use BIA, Commerce chose to apply the highest U.S. packing cost which SSAB reported for SSOX, *i.e.,* Commerce selected the highest figure from among those that plaintiff had calculated and

submitted. In a situation in which the range of figures could not be verified, the court concludes Commerce's rejection of the lower cost entries for the highest cost entry is not punitive. This is not a situation in which Commerce has rejected "low margin information in favor of high margin information that was demonstrably less probative of current conditions." *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed.Cir.1990). The range of cost numbers which SSAB provided could not be verified, so there is nothing in the record which would suggest that any of the figures were more or less probative of SSOX's actual U.S. shipping costs. In addition, the BIA figure which Commerce selected was one of several cost calculations that SSAB itself submitted. The court finds Commerce's choice of BIA for SSOX's U.S. shipping costs is supported by substantial evidence and in accordance with law.

With respect to SSOX's home market packing costs, SSAB was again unable to verify its submissions. *Final Determination* at 15,773. Commerce therefore resorted to partial BIA, assigning a zero value to SSOX's home market packing expenses. *Id.* Adjustments to foreign market value must be established to Commerce's satisfaction. *See* 19 U.S.C. § 1677b(a)(4) (1988) (explaining that a circumstance-of-sale adjustment must be established to Commerce's satisfaction); *see also* 19 C.F.R. §§ 353.54 (noting a party claiming an adjustment must establish its claim to Commerce's satisfaction) and 353.56(a) (1994) (providing that a circumstance-of-sale claim must be established to Commerce's satisfaction). As SSAB was unable to verify its home market packing costs, the court finds Commerce's decision to resort to partial BIA and its choice of BIA are supported by substantial evidence and in accordance with law.

### IV. Upward Adjustment on Sales Made "via" TAB

■ On occasion, TAB acted as a sales agent for certain SSAB steel sales. These sales are known as "via" sales: if TAB could not fill a customer's order from its own stock, (1) it placed an order with SSAB, (2) SSAB shipped the merchandise from its facility to the final customer, (3) SSAB billed TAB for the steel, and (4) TAB in turn billed the final customer for the steel plus a set percentage commission charge. Memorandum from Elizabeth Patience, Case Analyst, Office of Agreements Compliance, Dep't Comm., to File, at 6 (Aug. 31, 1995) [hereinafter *Analyst Memorandum*]. To summarize, the final, invoice price to the ultimate consumer was "base price" plus "commission." Upon verification, Commerce found that there were discrepancies in three of the reported commission rates, and, therefore, discrepancies in the final prices charged to the ultimate customer. *Id.; see also Final Determination* at 15,774. Of the three discrepancies, there were two cases in which the final price was underreported and one case in which the price was overreported. *Analyst Memorandum* at 6. Therefore, in light of these verification discrepancies, Commerce applied a BIA upward adjustment of 1.8% to all via sales prices. (Oral Argument Tr. at 42.)

SSAB does not contest that some of its via sales data submissions were erroneous. However, SSAB argues this BIA upward adjustment is not supported by substantial evidence. SSAB argues that discrepancies in the final, invoice prices occurred because there were differences in the commission rates, and that it should be the commission rates that are BIA-adjusted, not the final prices.

The court disagrees. In its verification, Commerce made a final price to final price comparison. Commerce selected a sample of sales, comparing the final prices based upon SSAB's submissions, which involved a fixed commission rate, with the final prices actually charged the ultimate customer. 42.9% of those comparisons yielded discrepancies (3/7 = 42.9%). Given this situation, the court finds Commerce's decision to apply an upward 1.8% adjustment, derived from the price differentials in the two underreported cases, to be supported by substantial evidence and in accordance with law.

### Conclusion

Upon consideration of plaintiffs' motion for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this court, defendant's and defendant-intervenor's responses

thereto, and the agency record, the court remands, in part, the *Final Determination* to Commerce to consider whether foreign market value should be adjusted based upon rebates SSAB granted to certain home-market customers. The remand results shall be filed with the court within thirty days from the date of this opinion. Any party contesting the remand results shall file comments within fifteen days of the remand results. Commerce may file its response to any comments within fifteen days of the filing of the comments. Commerce's *Final Determination* is sustained in all remaining respects.