Slip Op. 06-19

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

NSK LTD., et al.

       Plaintiffs,

    v.

UNITED STATES,

       Defendant,

and

TIMKEN US CORPORATION,

       Defendant-Intervenor.

_____

Before: WALLACH, Judge
Consol. Court No.: 04-00519

**PUBLIC VERSION**

[Plaintiff's Motion For Judgment Upon the Agency Record is Partially Denied and Partially Remanded to Commerce.]

**DATED:** January 31, 2006

Crowell & Moring, LLP, (Matthew Philip Jaffe, Robert A. Lipstein, Alexander H. Schaefer and Sobia Haque) for Plaintiffs NSK Ltd., NSK Corp., and NSK Precision America, Inc.

Barnes, Richardson & Colburn, (Donald J. Unger, Kazumune V. Kano, Diane A. MacDonald, Louisa Vassileva Carney and Nikolay A. Ouzounov) for Plaintiffs NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp., NTN-Driveshaft, Inc., and NTN-BCA Corp.

Sidley Austin Brown & Wood LLP, (Neil R. Ellis and Neil C. Pratt) for Plaintiffs Koyo Seiko Co., Ltd., and Koyo Corp. of U.S.A.

Stewart and Stewart, (Terence P. Stewart, William A. Fennell, Lane S. Hurewitz, and Geert De Prest) for Defendant-Intervenor Timken U.S. Corp.

Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Patricia M. McCarthy, Assistant Director; Michael D. Panzera, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Philip Curtin, Elizabeth Doyle, William J. Kovach, Jr., and Carrie Owens, Attorney-Advisors, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant United States.

**OPINION**

**Wallach, Judge:**

**I**
**Introduction**

Plaintiffs NSK Ltd., NSK Corp., and NSK Precision America, Inc. (collectively, "NSK");

NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp.,

NTN Driveshaft, Inc., and NTN-BCA Corp. (collectively, "NTN"); Koyo Seiko Co. Ltd., and

Koyo Seiko Corp. of U.S.A.; and Timken U.S. Corp. ("Timken") challenge the United States

Department of Commerce's ("Commerce" or "the Department") findings in Antifriction Bearings

and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom:

Final Results of Antidumping Duty Administrative Reviews, Rescission of Administrative

Reviews in Part, and Determination To Revoke Order in Part, 69 Fed. Reg. 55,574 (September

15, 2004) ("Final Results"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2004).

**II**
**Background**

On September 15, 2004, Commerce published in the Federal Register the Final Results of

its review of the antidumping duty orders on antifriction bearings and parts thereof from France,

Germany, Italy, Japan, Singapore, and the United Kingdom covering the period of review

2

("POR") of May 1, 2002, through April 30, 2003. Final Results at 55,574. The scope of this order covers antifriction balls, ball bearings with integral shafts, ball bearings (including radial ball bearings) and parts thereof, and housed or mounted ball bearing units and parts thereof.[1] Id. at 55,575. In the Final Results, Commerce found a 5.56% weighted-average dumping margin for Koyo, 2.74% for NTN, and 2.46% for NSK. See id. at 55,580.

On March 4, 2005, the Court consolidated all the cases challenging the Final Results of the thirteenth administrative review.[2] On August 23, 2005, this Court denied Plaintiff Koyo's Motion to Stay Count One of the Complaint concerning the zeroing issue pending appeals of NSK Ltd. v. United States, 358 F. Supp. 2d 1276 (CIT 2005); NSK Ltd. v. United States, 346 F. Supp. 2d 1312 (CIT 2004); and SNR Roulements v. United States, 341 F. Supp. 2d 1334 (CIT 2004); pending the resolution of certain dispute settlement proceedings at the World Trade Organization ("WTO"); as well as pending the determinations by the United States Trade

---

[1] Imports of these products are classified under the following Harmonized Tariff Schedules (HTSUS) subheadings:

> 3926.90.45, 4016.93.00, 4016.93.10, 4016.93.50, 6909.19.5010, 8431.20.00, 8431.39.0010, 8482.10.10, 8482.10.50, 8482.80.00, 8482.91.00, 8482.99.05, 8482.99.2580, 8482.99.35, 8482.99.6595, 8483.20.40, 8483.20.80, 8483.50.8040, 8483.50.90, 8483.90.20, 8483.90.30, 8483.90.70, 8708.50.50, 8708.60.50, 8708.60.80, 8708.70.6060, 8708.70.8050, 8708.93.30, 8708.93.5000, 8708.93.6000, 8708.93.75, 8708.99.06, 8708.99.31, 8708.99.4960, 8708.99.50, 8708.99.5800, 8708.99.8080, 8803.10.00, 8803.20.00, 8803.30.00, 8803.90.30, and 8803.90.90.

Final Results, 68 Fed. Reg at 35,623.

[2] NSK Ltd., NSK Corporation, and NSK Precision America Inc. v. United States, Court No. 04-00519; NTN Corporation, NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp., NTN Driveshaft, Inc., and NTN-BCA Corp. v. United States, Court No. 04-00527; Timken Co. v. United States, Court No. 04-00528; and Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. v. United States, Court No. 04-00530.

Representative ("USTR") and Commerce on whether to implement changes to the U.S. antidumping law if there is an adverse WTO decision. U.S. - Measures Relating to Zeroing and Sunset Reviews, WT/DS322/8 (February 7, 2005). The request to stay consideration of this issue pending the aforementioned appeals was denied because WTO adjudicatory decisions, while possibly persuasive, are not binding on this Court or Commerce; thus, staying consideration of Commerce's zeroing practice pending resolution of WTO proceedings was not warranted. See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826, at 1032 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040; Timken v. United States, 354 F.3d 1334, 1344 (Fed. Cir. 2004); Corus Staal B.V. v. Department of Commerce, 395 F.3d 1343, 1348 (Fed. Cir. 2005).

Oral argument was held on November 17, 2005.

**III**

**Standard of Review**

This court will sustain Commerce's determinations, findings, or conclusions unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (2004); Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1368 (Fed. Cir. 1999). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed 126 (1938)). Although the courts have considered substantial evidence to be something less than the weight of the evidence, the possibility of drawing two inconsistent conclusions from the presented evidence does not necessarily prevent an

4

administrative agency's finding from being supported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citing Labor Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106 (1942); Keele Hair & Scalp Specialists Inc. v. FTC, 275 F.2d 18, 21 (5th Cir. 1960)).

The court must use a two-step analysis when evaluating Commerce's statutory interpretation. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). The court examines, first, whether "Congress has directly spoken to the precise question at issue," in which case courts, "must give effect to the unambiguously expressed intent of Congress." See Household Credit Servs. v. Pfennig, 541 U.S. 232, 239, 124 S. Ct. 1741, 15 L. Ed. 2d 450 (2004); Id. at 842-3. Whenever Congress has "explicitly left a gap for the agency to fill," the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44. "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the [agency's] application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965) (quoting Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)).

**IV**
**ANALYSIS**
**A**
**Commerce's Practice of Zeroing Is Supported by Substantial Evidence and Is In Accordance With Law**

5

Each Plaintiff argues in turn that Commerce's practice of assigning a zero margin to export price ("EP") or constructed export price ("CEP") sales made above normal value ("NV") is a violation of either U.S. antidumping law or a WTO dispute settlement decision. Memorandum of Points and Authorities in Support of NSK's Motion For Judgment On The Agency Record ("NSK's Brief") at 2; Memorandum of Points and Authorities in Support of Motion of Plaintiffs Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A for Judgment on the Agency Record ("Koyo's Brief") at 13; Rule 56.2 Motion and Memorandum for Judgment on the Agency Record Submitted on Behalf of Plaintiffs NTN, et al. ("NTN's Brief") at 2; 19 U.S.C. § 1673. Plaintiffs further argue that the court should reconsider its earlier decisions regarding zeroing because this case is distinguishable from the U.S. zeroing case before the WTO. See U.S. - Measures Relating to Zeroing and Sunset Reviews, DS322 (Request for Consultations filed by Japan on November 24, 2005); see also NTN's Brief at 5-6, 12-14.

The issue of zeroing has been affirmed and settled by the Federal Circuit in Corus Staal, 395 F.3d at 1348-49. There is thus no reason to overturn Commerce's zeroing practice based upon a ruling by the WTO "unless and until such ruling has been adopted pursuant to the specified statutory scheme." Id. No such ruling has been adopted in this case; consequently, there is no reason to re-examine the issue of zeroing at this juncture. Commerce's interpretation need only be a reasonable interpretation of the statute and that Commerce's interpretation has been upheld several times based on that standard. See id. at 1347; Timken 354 F.3d at 1342.

Simply because Plaintiffs wish to challenge a particular holding does not make it irrelevant or not controlling. As Defendant-Intervenor aptly states "'to embrace the novel precept that a precedent is not controlling – no matter how clear it is – if counsel in a subsequent

proceeding can advance a new argument on the point'" would enable Plaintiffs to avoid precedent absent proof of changed circumstances. Response of Timken US Corporation to the Rule 56.2 Motions of Koyo Seiko Co., Ltd., et al., NSK Ltd., et al., and NTN Corporation, et al. ("Timken's Response") at 6-7 (citing Matter of Penn Central Transp. Co., 553 F.2d 12, 15 (3d Cir. 1977). In this case, none of the Plaintiffs offer a valid reason why the Court should disregard *stare decisis* and Commerce's interpretation concerning its zeroing methodology in administrative reviews. Commerce's practice continues to be a reasonable interpretation of the statute, it is supported by substantial evidence and is in accordance with law.

**B**

**NSK's Challenge of Commerce's Model Matching Methodology is Not Ripe for Adjudication**

NSK challenges Commerce's decision to discontinue the use of its model matching methodology in the Fourteenth (Period of Review ("POR") 2002-2003) and Fifteenth (POR 2003-2004) administrative reviews of ball bearings. NSK's Brief at 3-4. NSK argues that Commerce made a final determination to "abandon its long-established practice of matching models using the 'family' approach" without support of empirical evidence and on that basis the Court should reinstate the family approach. Id. at 7-8. At oral argument, NSK further argued that it was "effectively hamstrung from being able to comply with the laws" as a result of Commerce's departure from the family approach, without adopting a new approach.

Defendant counters that Commerce's model matching methodology is not ripe for review because Commerce has not rendered a final determination to change its methodology. Defendant's Response to Plaintiffs' Motion For Judgment Upon the Administrative Record ("Defendant's Response") at 18. Defendant further argues that Plaintiff was not negatively

7

affected because Commerce had not yet adopted a new methodology in the Fourteenth review. Id. at 20.

Timken argues that NSK has misstated the facts, saying Commerce did not make any changes to its methodology in the 2002-2003 review at issue before this court. Timken's Response at 10. In the instant review, Commerce stated that "we have determined that it is appropriate to change the methodology only after the parties have had a meaningful opportunity to comment on the proposed changes." Ball Bearings (and Parts Thereof) from France, Germany, Italy, Japan, Singapore, and the United Kingdom - Model Match Methodology, dated December 3, 2003 ("Commerce Model Match Memorandum") at 5-6; Timken's Response at 16. Therefore, Timken says, Commerce's decision to change its methodology in the next 2003-2004 review is not yet ripe for adjudication. Id. at 18.

A matter is not ripe for judicial review "where administrative proceedings are in process, and the agency has not adopted a final decision." U.S. Ass'n of Imps. of Textiles & Apparel v. United States, 366 F. Supp. 2d 1280, 1283 (CIT 2005) (quoting Special Commodity Group on Non-Rubber Footwear v. Baldrige, 6 CIT 264, 269, 575 F. Supp. 1288, 1293 (1983)). The Supreme Court has stated that "[t]wo conditions must be satisfied for agency action to be 'final.'" Bennett v. Spear, 520 U.S. 154, 177, 137 L. Ed. 2d 281, 117 S. Ct. 1154 (1997).

> First, the action must mark the consummation of the agency's decisionmaking process . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Id. at 177-78 (internal quotation marks & citations omitted). Therefore, an agency action is final if, as the Supreme Court has said, it is "'definitive'" and has a "'direct and immediate . . . effect on the day-to-day business'" of the party challenging it. Nat'l Ass'n of Home Builders v. United

8

States Army Corps of Eng'rs, 417 F.3d 1272, 1278 (2005) (citing FTC v. Standard Oil Co., 449 U.S. 232, 239, 66 L. Ed. 2d 416, 101 S. Ct. 488 (1980) (quoting & citing Abbott Labs. v. Gardner, 387 U.S. 136, 152, 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99, 105, 51 L. Ed. 2d 192, 97 S. Ct. 980 (1977)); see also Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 355 U.S. App. D.C. 346, 324 F.3d 726, 731 (D.C. Cir. 2003).

Addressing the tentativeness prong, Commerce's statement giving reasons for possibly utilizing a new methodology in the next review is not reflective of Commerce's "consummation of [its] decisionmaking process." Bennett, 520 U.S. at 178. A final change would be issued as a Federal Register notice or incorporated in the preliminary results of the review. In the context of the review before this court, the only evidence in the record concerning a change in Commerce's methodology is tentative; there is no definitive statement or action that demonstrates the existence of a final decision. There has been no action by Commerce concerning a change in the model-matching methodology in the Fourteenth review that affects NSK's ability to conform to subsequent administrative reviews; any change or resulting negative effect regarding the model match methodology in the next review is purely speculative. The absence of a replacement methodology also reveals the tentativeness of this issue. Since there is, at most, a tentative decision, it is unnecessary to address the consequences prong of the test.

Although Commerce invited comments and may revise its methodology in the next review, it did not change its methodology in the review at issue before the court. Defendant's Response at 19-20. The administrative record shows that Commerce did not make a "final" determination concerning its future use of the family method methodology in this review. Id. at

9

27. Commerce explained that a new methodology in the Fourteenth administrative review was necessary on account of:

> the staggering rate of technological change since we first devised the family-averaging methodology and the broad availability of powerful computing tools...[which] will enable us to make comparisons more precisely than the current methodology allows.

Commerce Model Match Memorandum at 4. However, the 2003-2004 administrative review is not before this court for review at this juncture. A statement by Commerce that it plans to review its methodology in the future is not enough for this court to exert jurisdiction over this claim. Any changes to Commerce's methodology in the future can only be challenged in the context of that review. See Sharp Electronics Corp. v. United States, 720 F. Supp. 1014, 1016 (CIT 1989); see also United States Ass'n of Importers of Textiles and Apparel v. United States, 413 F.3d 1344, 1349 (Fed. Cir. 2005). Commerce has not definitively stated whether it will discontinue using the family approach or whether it will make a final determination to alter its model match methodology. In the absence of a final agency determination, and because the 2003-2004 review is not before this court, this claim is not ripe for adjudication.

C

**Koyo's Negative Billing Adjustments Were Unreasonably Disallowed By Commerce**

Koyo argues that Commerce's denial of its lump-sum negative billing adjustments in the Fourteenth administrative review was unsupported by substantial evidence. Koyo's Brief at 20. Additionally, Koyo asserts that if Commerce considers Koyo's billing adjustments distortive, it should deny all, and not only the negative adjustments.[3] Id. Koyo argues that its reporting

---

[3] Commerce denied Koyo's negative adjustments for its BILADJ2Hs (sales in which EP exceeded NV), but allowed all of Koyo's positive adjustments. Defendant's Response at 28. BILADJ2Hs "are made up of those adjustments that Koyo allocates on a customer-specific basis .

10

methodology was unchanged from prior reviews which was well-established and accepted by the Department in the past. Id. at 22. Koyo also says that it was not notified of Commerce's decision in time for Koyo to respond and provide proof that its reported billing adjustments were not distortive. Id. at 26. Koyo further argues that Commerce failed to follow the necessary steps mandated by the statute prior to using "facts otherwise available" and thereby denying Koyo its negative billing adjustments. Id. at 29.

Commerce says it disallowed Koyo's negative billing adjustments because Koyo's allocation methodology caused "unreasonable distortions." Defendant's Response at 28. Defendant further argues that even though it accepted Koyo's allocation methodology and found it non-distortive in prior reviews, Koyo is not relieved from demonstrating that its allocation continues to be non-distortive in the current review. Id. at 38. Because Koyo did not meet its burden of demonstrating that its billing adjustment was accurate, Defendant contends that Commerce's denial of the adjustments was supported by substantial evidence. Id.

At oral argument, both Koyo and Defendant clarified their arguments on this issue. Koyo argues that because it used the same methodology for allocating billing adjustments which was upheld in all previous reviews, its methodology cannot suddenly be labeled distortive. In contrast, Commerce argues that Koyo's billing adjustments are distortive based on the evidentiary finding made during home market sales verification, and it is not Koyo's methodology itself that is problematic. Therefore, says Defendant, Koyo's argument that it should have been given the opportunity to submit more information fails because no more

---

. . consisting primarily of [tapered roller bearings], cylindrical roller bearings, and spherical plain bearings, [which] are similar to ball bearings in value, physical characteristics, and the manner in which they are sold]." Koyo's Section B Questionnaire Response at B-16 to -20 (October 6, 2003), C. Doc. 25/P. Doc. 148; Koyo's Brief at 10.

information is necessary for Commerce to make its determination. It is the facts themselves that are distortive.

In determining whether or not Commerce's methodology is reasonable, the Court must examine the facts as presented to Commerce. See generally, Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). In this instance, Commerce found Koyo's allocation to be "unreasonably distortive" because the billing adjustments "'were incurred during time periods that did not correspond to the POR'" and because Koyo reported adjustments on all models, even when not incurred on all of them. See Defendant's Supplemental Brief ("Defendant's Supp. Br.") at 1-2; see also Defendant's Response at 33 (citing Koyo Final Results Analysis Memorandum, at 2-3).

Commerce looked at the magnitude and the frequency of the distortions in making its ultimate determination. Id. These adjustments, according to Commerce, were "not insignificant," and sometimes represented over [a percentage] of the gross unit price, "the regulatory standard of insignificant adjustments." Id. at 3 (quoting Commerce's Final Results Analysis Memo for the Fourteenth Administrative Review ("Final Results Memo") at 3, ¶ 2; see 19 C.F.R. § 351.413). Defendant argues these "not insignificant" distortions occurred with many customers and in [a percentage] of sales. Id.

Defendant argues that its determination to allow only Koyo's positive billing adjustments, while disallowing its negative adjustments, is supported by SKF v. United States, in which the Court stated this practice was acceptable because Commerce needs to give certain incentives for companies to report in an efficient manner. SKF v. United States, 23 CIT 905, 77 F. Supp. 2d 1335, 1340 (1999); see also INA Walzlager Schaeffler KG v. United States, 21 CIT 110, 957 F.

Supp. 251, 265-68 (1997). In <u>INA</u>, the Court established that both positive and negative adjustments are similar in nature, in that both are direct adjustments to fair market value (FMV) and must be reported similarly. <u>See</u> <u>INA</u>, 957 F. Supp. 251 at 257. The Court's remand order in <u>INA</u>, however, instructed Commerce to deny only the negative adjustments. <u>Id.</u> at 276. Commerce interprets this action to mean that separate treatment is possible and all adjustments need not be treated equally, in light of a finding that Commerce properly denied negative adjustments because the company failed to tie the expenses to specific transactions or products. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Torrington Co. v. United States</u>, 82 F.3d 1039, 1050-51 (Fed. Cir. 1996). <u>INA</u>, however, is distinguishable because the foreign producer was not forthcoming in disclosing its reporting methodology, and Commerce denied its negative billing adjustments to create an incentive for the company to accurately report its adjustments. Here, Koyo has repeatedly stated that it is reporting its adjustments to the best of its ability, so Commerce's "incentive" is actually punitive in this case, absent a specific determination why Koyo needs that incentive to do a better job of reporting.

There has been no factual showing that Koyo is able to produce more specific data on the particular allocation of its billing adjustments, and Commerce has presented no legal or factual basis to deny only the negative adjustments as an "incentive." Only allowing Koyo's positive adjustments, in effect, raises Koyo's dumping margin. <u>See</u> <u>SKF</u>, 77 F. Supp. 2d at 267. In the absence of evidence in the record showing that Koyo had been recalcitrant in providing information to the Department, Commerce does not have a reasonable justification for its differential treatment of the billing adjustments. Based upon Commerce's reasoning and the evidence before it at the time of issuing the <u>Final Results</u>, Defendant's determination is not in

13

accordance with law.

**D**

**Commerce's Decision Not to Exclude NTN's High Profit Sales Is Not Supported By Substantial Evidence and Is Not in Accordance With Law**

NTN argues that its high profit sales should be excluded as sales outside the ordinary course of trade from both the home market database as well as from constructed value. NTN's Brief at 18, 23. NTN states that the "ordinary course of trade" statute provides for the exclusion of sales that are not in the ordinary course of trade to "prevent dumping margins from being based on sales which are not representative." Id. (quoting Monsanto Co. v. United States, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988)); 19 U.S.C. § 1677(15). NTN claims that its high profit sales were just that, extraordinary sales in small quantities and profits that were abnormally high when compared to the majority of its other home market sales. NTN's Brief at 19. At oral argument, NTN explained these sales were made "in the general course of business . . . infrequently but on a fairly regular basis over a period of time . . . [for] a sampling or a particular part for a particular need." As a result, NTN argues that these sales should have been excluded so as to not distort the calculated dumping margin. NTN claims that the exclusion of these sales is consistent with the statute and in accordance with law. NTN's Brief at 22; 19 U.S.C § 1677(15).

In NTN's Section B Questionnaire Responses, it explained that its high profit sales were "aberrational" because the quantity involved is minute compared with sales of the same model number in the ordinary course of trade, and provided a chart with illustrative examples. NTN's Brief at 21 (citing NTN's Section B Response at B-48, B-49 (September 25, 2003)). Commerce requested that NTN provide additional evidence demonstrating that its sales with higher profits

14

were outside the ordinary course of trade, and NTN submitted a numerical chart comparing its "high profit" sales to its "ordinary course" sales. Id. at 22 (citing Supplemental Questionnaire Response at 18-19, and Att. B-10 (Dec. 10, 2003), C.R. Doc. 60, P.R. Doc. 210). Commerce denied NTN's proposed adjustment, explaining that "high profits by themselves are not sufficient for us to determine that sales are outside the ordinary course of trade" and that "extraordinary characteristics" must be present which would make them unrepresentative of the home market. Id. at Appendix 2, Issues and Decision Memorandum for the Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom for the Period of Review May 1, 2002, through April 30, 2003, dated September 8, 2004, at 73.

Defendant counters that Commerce's determination not to exclude NTN's high profit sales is supported by substantial evidence and is in accordance with law because they are sales within the ordinary course of trade pursuant to 19 U.S.C. § 1677b(a)(1)(B)(i). Defendant's Response at 44-45. Commerce argues that NTN did not prove that the sales in question had abnormally high profits as well as other extraordinary characteristics that would make them unrepresentative of home market sales. Id at 46-47.

The party requesting a price adjustment bears the evidentiary burden "of proving whether sales used in commerce's calculations are outside the ordinary course of trade . . . ." Nachi-Fujikoshi Corp. v. United States, 16 CIT 606, 608, 798 F. Supp. 716, 718 (1992) ("Nachi-Fujikoshi"); see also Koyo Seiko Co. v. United States, 16 CIT 539, 543, 796 F. Supp. 1526 (1992) ("Koyo"). Absent adequate evidence to the contrary, Commerce will treat sales as within the ordinary course of trade. See, e.g., Torrington Co. v. United States, 127 F.3d 1077, 1081

15

(Fed. Cir. 1997).

This court has held that Commerce has the discretion to determine which sales are within the ordinary course of trade in the absence of evidence establishing "unique and unusual circumstances." See NTN Bearing Corp, et al., v. United States, 306 F. Supp. 2d 1319, 1346 (CIT 2004) ("NTN") (according to Commerce Chevron deference is not warranted because of the "lack of guidance of both the statutory language and the legislative history regarding what is considered to be outside the 'ordinary course of trade'") (citing Chevron, 467 U.S. at 842); see also NTN Bearing Corp., et al., v. United States, 24 CIT 385, 104 F. Supp. 2d 110, 147 (2000); see also 19 U.S.C. § 1677b(a)(1)(B).  When determining whether a sale is outside the ordinary course of trade, Commerce considers not just "one factor in isolation but rather . . . all the circumstances particular to the sales in question." CEMEX, S.A. v. United States, 133 F.3d 897, 900 (Fed. Cir. 1998) (quoting Murata Mfg. Co. v. United States, 820 F. Supp. 603, 607 (CIT 1993)).

The court in NTN did not allow NTN's high-profit sales as sales outside the ordinary course of trade. See NTN, 306 F. Supp. 2d at 1344.  However, NTN's position in this case is distinguishable because it is arguing not only that its sales were high profit, but also that they were limited and not in the usual commercial quantities, in addition to special circumstances. Some of the extraordinary circumstances that NTN name include "sales for maintenance and repair, sales to research and development facilities for testing or evaluation and other sales outside the usual channels of trade." See Questionnaire Response B at B-48, B-49.  These descriptions of various sales are sufficient evidence for Commerce to assess the characteristics of NTN's purported sales outside the ordinary course of trade.

16

In its brief, the Government states that NTN relies upon "the high profit and <u>low volume</u> of these sales to 'show the distinct 'unique and unusual' characteristics of NTN's high profit sales.'" Defendant's Response at 46 (emphasis added). As support for its argument, Defendant relies upon Commerce's statement from the December 3, 2003 Issues and Decision Memo, where Commerce explained that "high profits are not enough by themselves" to show sales outside the ordinary course of trade." <u>See</u> Issues and Decision Memo, at cmt. 33; Defendant's Response at 46. However, low volume sales are not mentioned in the Decision Memo. The Department also overlooks the fact that the Court has looked to sales "not sold in usual commercial quantities" as probative of sales outside the ordinary course of trade. <u>See</u> <u>Nachi-Fujikoshi</u>, 16 CIT at 608; <u>see</u> <u>also</u> <u>Koyo</u>, 16 CIT at 543.

Defendant claims that NTN did not submit "<u>any evidence</u> suggesting that these sales have <u>any characteristics</u> that would make them extraordinary for the home market. " <u>See</u> <u>Issues and Decision Memo</u> at 74 (emphasis added). A review of the administrative record reveals that NTN has submitted evidence relating to this issue. <u>See</u> NTN's Brief at 19-24 (citing NTN's Questionnaire Response, Exhibit B-10; NTN's Supplemental Response (December 10, 2003). Commerce has failed to provide adequate reasoning why it denied NTN's adjustment in light of the evidence and precedent supporting NTN's position, and why NTN's high profit sales, sold in minute quantities in comparison with NTN's usual commercial quantities, were not outside the ordinary course of trade.

The administrative record contains substantial evidence lending credence to NTN's argument that its sales were not sold in the ordinary commercial quantities in comparison to its ordinary sales with the same control number. <u>See</u> <u>Nachi-Fujikoshi</u>, 16 CIT at 608; <u>see</u> <u>also</u> <u>Koyo</u>,

17

16 CIT at 543. Commerce seeks to explain its reasoning for denying NTN's high profit sales by relying on its Issues and Decision Memo, which does not support Defendant's position here. See Issues and Decision Memo, at cmt. 33. As a result, Commerce's determination that NTN's sales were outside the ordinary course of trade is not supported by substantial evidence and is not in accordance with law. This issue is remanded to Commerce to further explain its reasoning why the evidence submitted by NTN was insufficient under governing law.

E

### Commerce Properly Excluded Certain Inventory Costs from NCBA's Indirect Selling Expenses

Timken argues that Commerce should treat NTN's scrap inventory write-off expenses as an indirect expense incurred by NTN Bearing Corporation of America ("NBCA") to make U.S. sales of its imports from Japan. Timken's Brief at 2. Timken claims that these expenses are associated with doing business in the United States and as a result should be treated as such and not as a cost of production associated with manufacturing the product in Japan. Id. at 6. Timken further argues that since NBCA is a sales company all expenses associated with its operations are selling expenses and not costs associated with producing the merchandise. Id. at 6. Additionally, Timken argues that the write off is a selling expense simply because NCBA lists it as an "expense" in its books. Id. at 7-8. Accordingly, scrap inventory write-offs should be treated as a selling expense to NBCA. Id.

NTN argues that Commerce correctly concluded that expenses related to the write-off of scrap inventory are not selling expenses and should not be included in NTN's indirect selling expenses. Reponse Brief Submitted on Behalf of Plaintiffs NTN Corp., et al., In Opposition To Timken's Motion for Judgment Upon The Agency Record ("NTN's Response") at 3. According

to NTN, the scrap inventory is inventory that did not sell, therefore it cannot be reported as a selling expense related to the sale of merchandise to an unaffiliated customer. Id. at 4.

Commerce argues that it properly excluded the scrap inventory write-off from NBCA's indirect selling expenses. Defendant's Response at 55. According to Commerce, the Department's regulations specifically state that Commerce "'will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States.'" Id. at 56 (citing 19 C.F.R. § 351.402(b)). Because the inventory at issue was not sold, there was no sale to an affiliated or unaffiliated importer within the meaning of the statute. Id. Section 1677a(d)(1) states that U.S. selling expenses must be directly related to or the result of an actual sale. See 19 U.S.C. § 1677a(d)(1). As Defendant correctly points out, scrap inventory write-offs are by definition not associated with an actual sale. Defendant's Response at 57. Therefore, Commerce conducted its analysis of NTN's costs and expenses on this basis.

Commerce also properly concluded that the cost of producing the finished inventory was captured during the current period of review and therefore any write-offs associated with finished goods inventory should be adjusted to the captured and reported costs. Id. at 58. Timken's argument that Commerce should have made its calculations based on the period during which NCBA's goods were sold, rather than during the period of review is incorrect. Timken's Reply at 5. Commerce explains in its Brief that "all costs incurred during a period to produce subject merchandise are generally allocated to all finished product during that period [regardless of whether the output was actually sold or inventories on the company's financial statements. ]." Defendant's Response at 58. It would be inaccurate for Commerce to double count from a previous review. Id. Accordingly, Commerce's decision to not treat NBCA's scrap inventory

19

write off as an indirect selling expense in the context of the period of review is supported by substantial evidence and in accordance with law.

## V

## Conclusion

For the above stated reasons, Commerce's determination is partially sustained and partially remanded for action consistent with this opinion.

_/s/ Evan J. Wallach___
Evan J. Wallach, Judge

Dated: January 31, 2006
New York, New York

20