# United States Court of Appeals for the Federal Circuit

2007-1114, -1128, -1129

NSK LTD., NSK CORPORATION, and NSK PRECISION AMERICA, INC.,

Plaintiffs-Appellants,

and

AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN-BCA CORPORATION, NTN-DRIVESHAFT, INC.,
NTN BEARING CORPORATION OF AMERICA, and NTN CORPORATION,

Plaintiffs-Appellants,

and

KOYO CORPORATION OF U.S.A. and KOYO SEIKO CO., LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

TIMKEN US CORPORATION,

Defendant-Appellee.

Matthew P. Jaffe, Crowell & Moring LLP, of Washington, DC, for plaintiffs-appellants NSK Ltd, NSK Corporation, and NSK Precision America, Inc. With him on the brief were Robert A. Lipstein and Alexander H. Schaefer. Of counsel was Sobia Haque.

Diane A. MacDonald, Baker & Mckenzie LLP, of Chicago, Illinois, argued for plaintiffs-appellants American NTN Bearing Manufacturing Corporation, et al. With her on the brief were Donald J. Unger and Louisa V. Carney.

Neil R. Ellis, Sidney Austin LLP, of Washington, DC, argued for plaintiffs-appellants KOYO Corporation, et al. With him on the brief was Neil C. Pratt. Of counsel were Jill Caiazzo and Lawrence R. Walders.

Claudia Burke, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. On the brief were Peter D. Keisler, Acting Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Michael Panzera, Attorney. Of counsel on the brief were Jennifer I. Johnson, Mykhaylo Gryzlov, and Nithya Nagarajan, Attorneys, United States Department of Commerce, Office of Chief Counsel for Import Administration, of Washington, DC.

Geert DePrest, Stewart and Stewart, of Washington, DC, argued for defendant-appellee Timken US Corporation. With him on the brief were Terence P. Stewart and William A. Fennell. Of counsel was Lane S. Hurewitz.

James P. Durling, Vinson & Elkins LLP, of Washington, DC, for Amicus Curiae. With him on the brief were Matthew R. Nicely and David T. Hardin.

Appealed from: United States Court of International Trade

Judge Evan J. Wallach

# United States Court of Appeals for the Federal Circuit

2007-1114, -1128, -1129

NSK LTD., NSK CORPORATION, and NSK PRECISION AMERICA, INC.,

Plaintiffs-Appellants,

and

AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN-BCA CORPORATION, NTN-DRIVESHAFT, INC.,
NTN BEARING CORPORATION OF AMERICA, and NTN CORPORATION,

Plaintiffs-Appellants,

and

KOYO CORPORATION OF U.S.A. and KOYO SEIKO CO., LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

TIMKEN US CORPORATION,

Defendant-Appellee.

_____

DECIDED:  December 14, 2007

_____

Before LOURIE, DYK, and PROST, <u>Circuit Judges</u>.

PROST, <u>Circuit Judge</u>.

NSK Ltd., NSK Corporation, and NSK Precision America, Inc. (collectively, "NSK"), American NTN Bearing Manufacturing Corporation, NTN-BCA Corporation, NTN-Driveshaft, Inc., NTN Bearing Corporation of America, and NTN Corporation (collectively, "NTN"), and Koyo Corporation of U.S.A. and Koyo Seiko Co., Ltd. (collectively, "Koyo") appeal a January 31, 2006, decision of the United States Court of International Trade affirming various determinations made by the United States Department of Commerce ("Commerce") in the administrative review of the antidumping duty order on antifriction bearings imported from Japan, covering the period of May 1, 2002, through April 30, 2003, and dismissing a challenge by NSK to Commerce's recommendation to change model-match methodologies in future reviews. NSK Ltd. v. United States, 416 F. Supp. 2d 1334 (Ct. Int'l Trade 2006) ("NSK I"). Koyo and NTN also appeal an October 23, 2006, decision of the Court of International Trade affirming other determinations made by Commerce as part of the administrative review. NSK Ltd. v. United States, 462 F. Supp. 2d 1254 (Ct. Int'l Trade 2006) ("NSK II"). Because Commerce's determinations are supported by substantial evidence and in accordance with law, and because NSK's challenge was not ripe for adjudication, we affirm.

## I. BACKGROUND

On September 15, 2004, Commerce published in the Federal Register the final results of the administrative review of the antidumping duty orders on antifriction bearings and parts thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, covering the period from May 1, 2002, through April 30, 2002. Antifriction Bearings and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews,

Rescission of Administrative Reviews in Part, and Determination to Revoke Order in Part, 69 Fed. Reg. 55,574 ("Final Results"). In these results, Commerce found weighted-average dumping margins for Koyo, NTN, and NSK of 5.56%, 2.74%, and 2.46%, respectively. Id. at 55,580. Koyo, NTN, and NSK each filed a challenge to Commerce's determinations, and their cases were consolidated into a single action on March 4, 2005.

On January 31, 2006, the Court of International Trade affirmed various determinations made by Commerce that had been challenged by Koyo, NTN, and NSK, including Commerce's practice of zeroing negative dumping margins in its weighted-average dumping margin calculations. NSK I, 416 F. Supp. 2d at 1338-39. The Court of International Trade also dismissed for lack of jurisdiction a challenge by NSK to a recommendation by Commerce that it change its model-match methodology in future administrative reviews. Id. at 1339-40. The Court of International Trade, however, rejected Commerce's differential treatment of positive and negative home market billing adjustments by Koyo that Commerce contended were equally distortive, and remanded Commerce's determination to include certain small-volume, high-profit sales by NTN in its value calculations for further explanation. Id. at 1340-44. In response, Commerce rejected both Koyo's positive and negative billing adjustments and provided further explanation for its inclusion of NTN's small-volume, high-profit sales. The Court of International Trade affirmed. NSK II, 462 F. Supp. 2d at 1260. Koyo, NTN, and NSK now appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II.  DISCUSSION

### A.  Standard of Review

This court reviews antidumping determinations made by Commerce using the same standard of review used by the Court of International Trade.  F.Lii De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed. Cir. 2000). This court will uphold Commerce's determinations unless they are unsupported by "substantial evidence on the record, or otherwise not in accordance with law."  Id. Questions of law, including questions of statutory interpretation, are reviewed de novo; evidentiary decisions are reviewed for abuse of discretion; and findings of fact are reviewed for clear error.  Id.

### B.  Commerce's Zeroing of Negative Dumping Margins

On appeal, NSK, NTN, and Koyo each challenge Commerce's long-standing practice of "zeroing" negative dumping margins when computing antidumping duties.

Under the antidumping statute, Commerce is required to impose antidumping duties on imported merchandise that "is being, or is likely to be, sold in the United States at less than fair value" to the detriment of a domestic industry.  19 U.S.C. § 1673. Commerce calculates these antidumping duties by first calculating the amount by which the price a producer charges for the subject merchandise in its home market, i.e., the "normal value," exceeds the price charged in the United States, i.e., the "export price." This amount is referred to as the "dumping margin."  Commerce then calculates a weighted average of the dumping margins for the producer/exporter by dividing the aggregate dumping margins for that producer/exporter by the aggregate export prices charged by that producer/exporter.  Id. § 1677(35)(B).

Occasionally, the price charged for the subject merchandise in the United States is greater than the price charged for the same merchandise in the home market. This results in a negative dumping margin for that merchandise. In these situations, Commerce sets the negative dumping margins to zero when calculating the weighted average dumping margin. By doing so, the sum of the dumping margins calculated on the individual transactions is not reduced by the negative amount of the dumping margins. This practice is referred to as "zeroing" and has been repeatedly upheld by this court. See, e.g., Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004), cert. denied 543 U.S. 976 (2004); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343 (Fed. Cir. 2005), cert. denied 546 U.S. 1089 (2006); Corus Staal BV v. United States, 502 F.3d 1370 (Fed. Cir. 2007).

Recently, however, the Government of Japan initiated a World Trade Organization ("WTO") challenge of Commerce's zeroing practice. On January 9, 2007, the WTO Appellate Body issued a decision in which it found that Commerce's zeroing practice, as applied to the administrative review at issue in this case, is inconsistent with the United States' international obligations. See Appellate Body Report, United States – Measures Relating to Zeroing and Sunset Reviews, WT/DS322/AB/R (Jan. 9, 2007). The WTO Dispute Resolution Body adopted this decision on January 23, 2007. In response, on February 20, 2007, the United States issued a statement that "it intends to comply in this dispute with its WTO obligations and will be considering carefully how to do so." See Press Release, U.S. Mission to the United Nations in Geneva, U.S. Statements at the WTO Dispute Settlement Body, Delivered by David P. Shark, Deputy Chief of Mission, U.S. Mission to the WTO (Feb. 20, 2007).

In light of this statement, NSK, NTN, and Koyo seek to have this case remanded to Commerce to allow the agency to implement the WTO decision. Commerce, however, opposes such a remand. Although Commerce has stated that it intends to comply with its WTO obligations, it contends that it only plans to discontinue zeroing in investigations, not in administrative reviews such as this one.

As stated by this court in Corus Staal, "we . . . refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme." 395 F.3d at 1349; cf. Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 668 (Fed. Cir. 1992) ("While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did."). In this case, despite Commerce's public statement that it intended to comply with its WTO obligations, the WTO decision rejecting zeroing has not yet been implemented by Commerce. Moreover, the manner in which the WTO decision will be implemented by Commerce is far from clear, as illustrated by the parties' disagreement over whether Commerce will (or should) apply the WTO decision to administrative reviews such as this one. Situations such as this are just one example of the reasons this court refrains from commenting on international body decisions unless and until they have been adopted pursuant to the specified statutory scheme. Unless and until that happens, this court has nothing to review.

For similar reasons, a remand in this case would not be proper. Although a remand may afford the parties more time for Commerce to implement the WTO

decision, Commerce has already stated that such a remand would not result in the outcome Koyo, NTN, and NSK desire, i.e., the implementation of the WTO decision in this administrative review. Accordingly, until Commerce abandons zeroing in administrative reviews such as this one, a remand in this case would be unavailing. Therefore, because Commerce's zeroing practice is in accordance with our well-established precedent, until Commerce officially abandons the practice pursuant to the specified statutory scheme, we affirm its continued use in this case.

## C. Koyo's Billing Adjustment Allocations

Koyo also appeals Commerce's determination that Koyo's allocation of certain home market billing adjustments was unreasonably distortive.

As it has in previous reviews of the antidumping order, Koyo reported a number of billing adjustments to its home market prices in its initial questionnaire responses, including a number of customer-specific, lump-sum billing adjustments for which Koyo claimed to lack more specific information. Consistent with its long-standing practice of accepting adjustments that are not reported on a transaction-specific basis when it was not feasible for the party to report the adjustment on a more specific basis, provided the allocation method the party used does not cause unreasonable inaccuracies or distortions, see 19 C.F.R. § 351.401(g), Commerce accepted these allocations in its Preliminary Results. After reviewing a sample of the sales over which Koyo allocated lump-sum billing adjustments, however, Commerce noted that the samples included billing adjustments that were incurred over "time periods that did not correspond to the [period of review]" and that "actually occurred on specific models." On the basis of this report, Timken US Corp. ("Timken") challenged Koyo's lump-sum billing adjustment

allocations. After further analyzing Koyo's billing adjustment allocation, Commerce ultimately rejected Koyo's allocation in its Final Results, finding that "the allocation methodology Koyo used causes unreasonable inaccuracies and distortions."

Nonetheless, Commerce initially continued to use the allegedly distortive allocation for positive billing adjustments, i.e., those likely to increase the weighted-average dumping margin, but not negative billing adjustments, i.e., those likely to decrease the weighted-average dumping margin. According to Commerce, this would act as an "incentive" for Koyo to report its billing adjustments on Commerce's preferred transaction-specific basis. The Court of International Trade, however, rejected this differential treatment of positive and negative billing adjustments as punitive and not in accordance with law. NSK I, 416 F. Supp. 2d at 1342. In response, Commerce denied all of Koyo's lump-sum billing adjustments as unreasonably distortive, and the Court of International Trade affirmed. NSK II, 462 F. Supp. 2d at 1259.

On appeal, Koyo argues that (1) Commerce's determination that Koyo's allocation of its lump-sum billing adjustments is unreasonably distortive is contrary to Commerce's established criteria for making such a determination, (2) it was not given a meaningful opportunity to demonstrate that its allocation of its lump-sum billing adjustments is not distortive, and (3) Commerce's decision to deny Koyo's billing adjustments is not supported by substantial evidence. We disagree.

Regarding Koyo's argument that Commerce's determination that Koyo's allocation is unreasonably distortive is contrary to its established criteria for making such a determination, Commerce's acceptance of an allocation methodology in a previous review does not relieve a party of its burden of demonstrating the methodology

is non-distortive in the current review. See NTN Corp. v. United States, 306 F. Supp. 2d 1319, 1329 (Ct. Int'l Trade 2004), aff'd 125 Fed. Appx. 1011 (Fed. Cir. 2005). That said, "[w]hen an agency deviates from a longstanding practice, it must explain why it has done so." Nucor Corp. v. United States, 414 F.3d 1331, 1340 (Fed. Cir. 2005). In this case, Commerce explained that, although it accepted Koyo's allocation methodology in previous reviews, in this review it directly observed clear evidence of a substantial distortion caused by the methodology. We construe that as a sufficient basis for Commerce to abandon its long-standing acceptance of Koyo's allocation methodology.

Despite this, Koyo contends that Commerce's determination that Koyo's billing adjustment allocation is unreasonably distortive is not supported by substantial evidence. In this case, Koyo totaled all billing adjustments on a customer-specific basis and allocated the total adjustment over all sales to that customer.

By allocating billing adjustments to all sales to a customer, Koyo's methodology potentially shifts billing adjustments from sales that are not used in calculating normal value to ones that are and vice versa. This could allow Koyo to spread positive billing adjustments on models imported to the United States across those not imported to the United States. Similarly, Koyo could spread negative billing adjustments on models not imported to the United States across those that are imported to the United States. Both of these would artificially deflate normal value for the imported goods and reduce the dumping margin calculated for the item.

Allocating billing adjustments between sales that occurred outside of the period of review with those that occurred during the period of review is equally prone to abuse, as it would allow Koyo to offset dumping during the period of review with non-dumped

sales outside of the period of review. This would defeat the whole purpose of having set periods of review for the administration of the antidumping order. Nonetheless, this court has previously approved of Commerce's adoption of Koyo's billing adjustment allocation methodology, based on Commerce's determination, from the information available to it at the time, that Koyo's allocation methodology "did not unreasonably distort the final adjustments" by improperly including out of scope sales or transactions outside the period of review. NTN Bearing Corp. of Am. v. United States, 295 F.3d 1263, 1268 (Fed. Cir. 2002).

However, in this case, Commerce analyzed a sampling of Koyo's lump-sum billing adjustments and found that Koyo allocated lump-sum billing adjustments from sales not used in calculating normal value to sales that are used in calculating normal value. In other words, when Commerce examined a sample of the paper records underlying Koyo's billing adjustments, it found that some of the adjustments reviewed related entirely to transactions outside either the scope of the antidumping order or the period of review, yet were allocated in part to scope merchandise during the period of review. In light of this finding, Commerce could reasonably require Koyo to demonstrate that its allocation methodology was nondistortive overall (for example, by using a broader sample of its underlying transactions), and Commerce did not err in determining that Koyo had not made an adequate showing of nondistortion. More importantly, Commerce found the distortive effect of this allocation to be substantial. For example, Commerce found that Koyo allocated home-market billing adjustments from products that did not belong in the same product family as any of the products Koyo sold in the United States to products it did sell in the United States, significantly

distorting the normal value for those products. In light of the potentially distortive effect of Koyo's billing adjustment allocation, and the fact that Commerce found actual distortion as a result of this allocation, we agree with the Court of International Trade that Commerce's determination that Koyo's allocation is unreasonably distortive is supported by substantial evidence.

Moreover, the fact that Koyo may or may not have been able to allocate its billing adjustments in a more specific manner is irrelevant. Commerce is not required to accept billing adjustments on an allocated basis. See 19 C.F.R. § 351.401(g)(1) ("The Secretary may consider allocated . . . price adjustments when transaction-specific reporting is not feasible." (emphasis added)). When Commerce does accept allocated billing adjustment, the party seeking a billing adjustment has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment, id. § 351.401(b)(1), and, if reporting on an allocated basis, that no more specific basis is feasible and that the allocation methodology does not cause inaccuracies or distortions, id. § 351.401(g)(2). Regardless of whether a more specific reporting basis is feasible, the simple fact is that Koyo failed to demonstrate that its allocation methodology does not cause inaccuracies or distortion. Accordingly, Commerce was within its rights to reject Koyo's billing adjustment allocation.

Furthermore, Commerce's previous acceptance of Koyo's allocation methodology does not give Koyo a vested interest in continuing to use a system once it has been found to be distortive. See NTN Corp., 306 F. Supp. 2d at 1329. As mentioned above, the use of a non-transaction-specific allocation methodology is not a right. See 19 C.F.R. § 351.401(b)(1). Regardless of the accounting problems Koyo

may face or the fact that Commerce previously attempted to accommodate them, the simple fact is that, in this review, Koyo did not meet its burden of demonstrating that its allocation methodology is not distortive. And while Koyo may contend that it was not given a meaningful opportunity to attempt to do so, we disagree.

After Timken challenged Koyo's lump-sum billing adjustments, Koyo had the opportunity to respond in its administrative rebuttal case brief. However, rather than substantively addressing Timken's arguments, Koyo merely argued that its adjustments had been accepted in prior reviews. The fact that Koyo did not take full advantage of the opportunity to respond does not mean that Koyo was not given a meaningful one.

Accordingly, for the reasons discussed above, Commerce's determination that Koyo's allocation of lump-sum billing adjustments is unreasonably distortive is affirmed.[1]

### D. Commerce's Inclusion of NTN's Small-Volume, High-Profit Sales

NTN challenges Commerce's decision to include certain small-volume, high-profit home market sales in its value calculations. According to NTN, this ignores the statutory requirement that antidumping calculations only include sales made in the "usual commercial quantities" and "in the ordinary course of trade."

---

[1] Koyo correctly urges that Commerce could not retroactively apply a more stringent requirement for record-keeping than that in effect when the records were created. See Princess Cruises, Inc. v. United States, 397 F.3d 1358, 1365-67 (Fed. Cir. 2005) (rejecting retroactive application of an administrative ruling requiring detailed records that could not be reproduced with respect to past events). However, we do not read Commerce's remand determination as denying Koyo's billing adjustment based on a failure to keep transaction-specific electronic records. Instead, we read it as rejecting Koyo's billing adjustment allocation based on the fact that, in this case, it was distortive. We do not view Commerce's rejection of Koyo's allocation as presenting a retroactivity problem in this case.

At issue are certain home market sales, such as "sales for maintenance and repair" and "sales to research and development facilities for testing or evaluation," that NTN claims were aberrational in that they involved smaller quantities and yielded higher profits than the majority of its other home market sales. Accordingly, NTN requested that Commerce exclude them from its value calculations. Commerce, however, denied NTN's request, explaining that "high profits by themselves are not sufficient for [Commerce] to determine that the sales are outside the ordinary course of trade" and that "extraordinary characteristics" must be present which would make them unrepresentative of the home market. NSK I, 416 F. Supp. 2d at 1343.

NTN appealed to the Court of International Trade, which initially concluded that Commerce failed to provide adequate reasoning for its denial of NTN's claim that certain sales were outside the ordinary course of trade in light of the substantial evidence and precedent supporting NTN's position. Id. at 1344. However, after remanding the issue to Commerce for it to further explain why NTN's evidence was insufficient, the Court of International Trade affirmed Commerce's remand determination to deny NTN's request to exclude its small-volume, high-profit sales from Commerce's value calculations. NSK II, 462 F. Supp. 2d at 1260. According to the Court of International Trade, Commerce had properly examined whether NTN's sales were "outside the ordinary course of trade" by analyzing the frequency of high profit sales, the quantity of high profit sales relative to other sales, whether certain types of sales were in the "ordinary course of trade," and whether the high profit sales were sold in abnormally low quantities. Id. As a result, the Court of International Trade found that the only factor distinguishing NTN's high profit sales from its other sales was the high profit itself.

Id. According to the Court of International Trade, that NTN was able to charge higher prices on these sales did not make the sales extraordinary. Id. We agree.

Generally, the party requesting a price adjustment bears the evidentiary burden of proving whether sales used in Commerce's calculations are outside the ordinary course of trade. See Torrington Co. v. United States, 127 F.3d 1077, 1081 (Fed. Cir. 1997). Absent adequate evidence to the contrary, Commerce may treat the sales as within the ordinary course of trade. Id.

In the present case, NTN contends that the sales at issue were aberrational in that they involved much smaller quantities and much higher profit margins than the majority of NTN's home market sales. That the sales in question may have been miniscule compared to the majority of NTN's home market sales, however, does not mean that the sales were outside the ordinary course of trade or made in unusual quantities. In fact, before the Court of International Trade, NTN described these small-volume, high-profit sales as being made "in the general course of business . . . [and] on a fairly regular basis." NSK I, 416 F. Supp. 2d at 1342-43. Nor does the fact that NTN was able to reap such high profits on these sales take them outside of the ordinary course of trade. Small-volume sales often yield higher profit margins than large-volume sales, as small-volume customers are typically unable to command volume discounts. NTN, by its own admission, routinely made these small-volume, high-profit sales "in the general course of business." The sales may have represented a small fraction of NTN's business, but they were a regular part of its business nonetheless. Accordingly, Commerce's inclusion of NTN's small-volume, high-profit sales in its value calculations is affirmed.

E. Commerce's Model-Match Methodology

Lastly, NSK challenges what it characterizes as Commerce's decision to abandon its long-established practice of matching models using the "family approach" in future administrative reviews.

During the course of the administrative review at issue in this case, Commerce issued a memorandum indicating that it is considering changing the model-match approach it uses for antidumping orders "in order to determine the single most similar comparison-market model, taking advantage of intervening technological developments, that make possible a more precise model match" in future reviews. NSK attempted to challenge this "decision" before the Court of International Trade, but the court dismissed NSK's challenge for lack of jurisdiction, saying the issue was not ripe for adjudication. NSK I, 416 F. Supp. 2d at 1340. We agree.

Generally, an agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision. Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967). As the Supreme Court has pointed out, this requirement is designed "to prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Id. at 148-49.

Accordingly, in order to be a final decision, and therefore ripe for judicial review, (1) there must be an agency action that marks "the consummation of the agency's decisionmaking process," i.e., it must not be merely tentative or interlocutory, and (2)

"the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177 (1997).

Although Commerce has recommended changing its model-match methodology, Commerce has not yet abandoned its previous methodology or adopted a new one.  In fact, Commerce has publicly stated that it will change its "methodology only after parties have had a meaningful opportunity to comment on the proposed change."  Commerce's recommendation to change its methodology in future administrative reviews was not, as NSK contends, the "consummation of the agency's decision-making process," and thus not a final decision.  Accordingly, we affirm the Court of International Trade's dismissal of NSK's challenge to Commerce's recommendation.

## III.  CONCLUSION

Because Commerce's determinations are supported by substantial evidence and in accordance with law, and because NSK's challenge to Commerce's recommendation to change its model-match methodology is unripe for adjudication, we affirm.

## AFFIRMED